## John G. Sherman et al. v. John Whiteside et al.

1. ADMINISTRATION OF ESTATES—*Allowance of Claims, When Conclusive.*—As to the personal estate, the allowance of a claim against an estate, not appealed from, is conclusive, both upon the executors and also upon the heirs and legatees, unless procured by fraud and collusion between the claimant and the executors.

2.  SAME—*A Claimant Is Not Bound to Offer Evidence for the Defense.*
—A claimant against an estate is not bound to offer evidence for the
defense.

3.  SAME—*Error of Executors in Not Producing Evidence Against a
Claim Does Not Vitiate Its Allowance.*—If the executors erred in judg-
ment in not producing evidence against a claim, that fact alone does
not vitiate the allowance of a claim, or show its allowance was procured
by fraud or collusion.

4.  SAME—*Fraud on the Part of Executors in Not Resisting a Claim
Not Participated in by the Claimant.*—Fraud on the part of the execu-
tors alone in not sufficiently resisting a claim against an estate, not par-
ticipated in by the claimant, will not authorize the court afterward to
set aside the allowance.

5.  EVIDENCE—*Entries of a Deceased Person in His Private Expense
Book, Not Evidence Against a Claimant.*—Entries by the deceased in a
private expense book, showing moneys expended for claimant when he
lived in the family of deceased, as a member thereof, while a minor,
are not made evidence against claimant upon a claim for services ren-
dered deceased at his request, long after that relation had terminated,
merely because of the fact that the executors permitted claimant to
copy from later pages of said expense book, items of money deceased
expended for claimant during the performance of said later services.

6.  SAME—*Entries by a Deceased Person of Credits in a Private
Ledger, When Not Evidence Against a Claimant.*—Entries by deceased
in a private ledger wherein he credited claimant with certain small
sums for part of the services included in the claim filed, and with which
entries claimant is in no way connected, are self-serving entries and not
admissible in evidence in favor of the estate against claimant.

**Administration of Estates.**—Appeal from the Circuit Court of Mc-
Henry County; the Hon. CHARLES E. FULLER, Judge, presiding.    Heard
in this court at the October term, 1900.    Affirmed.    Opinion filed Feb-
ruary 13, 1901.

E. D. SHURTLEFF and D. T. SMILEY, attorneys for appel-
lants.

D. B. SHERWOOD, attorney for appellees Lumley and
Bunker, executors, etc.

A. B. COON, attorney for appellee Whiteside;  I. R. CUR-
TIS, of counsel.

MR. JUSTICE DIBELL delivered the opinion of the court.
Zebulon E. Goodrich died testate in McHenry county
on or about August 8, 1897, and his will was duly admitted

to probate. It named between thirty and forty legatees, and appointed V. S. Lumley and George K. Bunker executors. December 6, 1897, was the date fixed by said executors for filing claims against said estate. On that date John Whiteside, also a legatee, filed a claim against the estate in the sum of $3,091.53 for " balance due for services, care, nursing and attention from August 1, 1891, to August 8, 1897." The executors objected to the allowance of said claim, and employed an attorney to resist it. The claim was tried on January 5, 1898, and allowed in the sum of $3,021. No appeal was taken from the allowance. On February 11, 1899, the appellants, who are a portion of the legatees, began this suit by filing a petition in the County Court against John Whiteside and the executors, asking that the allowance of the claim be set aside; that Whiteside be adjudged indebted largely to the estate, and that the amount of such indebtedness be ascertained and deducted from the legacy given Whiteside by the will. Afterward said petition was amended and demurred to, and the demurrers sustained and the amended petition dismissed. Petitioners appealed to the Circuit Court. In that court the demurrers were overruled. The executors filed an answer to the amended petition, and Whiteside filed a separate answer and two pleas. Petitioners filed general and special replications to the answers and pleas. There was a hearing before the court upon depositions, oral testimony and documentary evidence, and the court dismissed the petition. This is an appeal by the petitioners therefrom.

It is clearly established that there was sufficient personal estate to pay all the debts of the testator, including this claim, and also all the specific legacies. As to the personal estate, the allowance of a claim against an estate, not appealed from, is conclusive, not only upon the executors, but also upon the heirs and legatees, unless its allowance was procured by fraud and collusion between the claimant and the personal representatives. (Ward v. Durham, 134 Ill. 195; Gold v. Bailey, 44 Ill. 491.) Any other rule would lead to the intolerable practice of compelling persons hold-

ing claims against an estate to litigate them first with the administrator or executor, and afterward with the heirs or legatees upon the same points which might have been investigated in the first case. Whiteside's claim having been duly filed and contested and allowed, and no appeal prosecuted from the allowance, that judgment is conclusive in this proceeding unless the claim is fraudulent and its allowance was obtained by collusion between Whiteside and the executors.

The proof in this case shows that on the trial of the claim the estate was represented by a competent attorney; that the depositions of several witnesses were taken and read in evidence, and a number of witnesses testified orally. The petitioners here offered the depositions used in the County Court on the trial of the claim, and also called the witnesses who testified orally on the trial of the claim and ascertained from them, so far as they could recollect, what their testimony was, and also called the county judge to learn what he could remember of the circumstances of the trial. This proof shows there was a litigated trial of the claim, and that proof was introduced justifying the allowance of a large sum to Whiteside for his care and services for the deceased at various times during the last five or six years of his life. Whether that proof called for the allowance of the precise sum fixed by that judgment was obviously not a proper subject of inquiry upon the trial of this petition. It was shown that neither of the executors were specially acquainted with Whiteside; that one of them never spoke to him concerning his claim at all till after its allowance, and the other never spoke to him about it except to say that he would be required to prove his claim. It is difficult, therefore, to understand how it can be said from this record that there was any collusion between Whiteside and the executors.

The only matter connected with the allowance of this claim wherein the conduct of the executors is subject to any serious discussion, relates to certain accounts in books kept by deceased. Goodrich was childless and very old, and a man

of considerable wealth.   Whiteside, his grand-nephew, was born in 1870, and at or before 1874, when not more than four years old, was living with Goodrich as a member of his family, and did live there during his entire minority except when he was sent away to school, which was at the expense of Goodrich.   After he became of age, Whiteside left his uncle's home, lived elsewhere, and went to work for himself and married.   After his uncle became old and feeble and began to be afflicted with a combination of diseases which finally led to his death, he sent for Whiteside and asked him to come back to his home and stay there and take care of him.   Whiteside and his wife, in obedience to this request, removed to Goodrich's home;   and during most of the five or six years following, and up to the time of Goodrich's death, Whiteside gave him his personal care and attention night and day, although there were times when during a portion of each week he attended · to other business of his own, when his uncle's condition was not such as to require all of his personal attention.   Goodrich had some malignant growth, like cancer, which gave off offensive discharges; he became in such condition that he had no control of his bowels; and for various reasons the services which Whiteside performed for Goodrich were very unpleasant.   There were times when a trained nurse was in attendance, but much of the time Whiteside was with Goodrich night and day.   It is evident it was to Whiteside, Goodrich looked for these services in his last years rather than to any other of those who had at different times been members of his family.   It had been Goodrich's habit to keep an account book in which he set down each day all the various items of money expended by him and the purpose for which it was spent.   From the time that Whiteside first came into his family as a little child, whenever any money was spent for his clothing or any money was given to him for his own spending, Goodrich set it down in its regular place among the items of that day, and therefore this book of daily cash expenditures kept by Goodrich contained all the items of money that he had paid out for the boy from the time he

came into his family, including sums spent upon his school-
ing away from home. After Whiteside had married and
begun to work for himself and again returned to Goodrich's
house at his request, Goodrich furnished him with money
at times, and allowed him to buy articles at stores on his
account, and Goodrich set down each of these items in the
same book, which has been called a journal by the witnesses.
There are pages of this book during the last year of Good-
rich's life which are in the handwriting of Whiteside, who
doubtless set the items down at his uncle's request when his
uncle was in too feeble health to do it himself. Goodrich
had another book which he called his ledger, and on a cer-
tain page of that he procured Whiteside to write at the top
the words "John Whiteside," and place "Dr." and "Cr."
over the appropriate columns. To this ledger page Good-
rich had at some time transferred in gross sums the various
items he had expended for Whiteside from the time White-
side went away to school, and on the opposite side Good-
rich had credited Whiteside with services during various
periods of the time covered by this claim, at certain small
rates per month, and as to one of these credits it was there
stated it was by agreement with Roxanna, a sister of the
deceased, who had lived with him as a member of his family
at one time.

After this claim was filed the executors required of
Whiteside a bill of particulars. He took his uncle's journal
and copied off all entries his uncle had made therein of
money expended for him from the time he was twenty-one
years old, and gave the estate credit for them on the bill of
particulars. It does not appear that he then examined the
ledger, nor indeed is it shown that he ever knew during his
uncle's lifetime that the latter had given him these credits
at a small sum per month for his services at various times.
The theory of the petitioners is that both Whiteside and
the executors must have known of the entries on this jour-
nal of moneys spent for Whiteside from the time he was a
little boy, and of the transference to the ledger in gross
amounts of the sums spent for Whiteside after he went to

school as a charge against him, and of the credits which
Goodrich had given Whiteside on the ledger for his serv-
ices; that Whiteside by copying off the items spent for him-
self from the journal had made both the journal and the
ledger competent evidence against himself; that Whiteside
was guilty of fraud in not bringing the journal and ledger
to the attention of the court; and that the executors were
guilty of fraud in not offering these books in evidence. We
are unable to concur in these views. It is evident from the
proofs Whiteside was a member of his uncle's family during
his minority. The items as entered on the journal were
not entered as charges against Whiteside at all, but were
the methodical entry by Goodrich of his own expenditures
from day to day, with a statement of the nature of the ex-
penditure. The daily entry of these items had no tendency
to show that Goodrich intended Whiteside should remuner-
ate him therefor. Whatever may have been his object in
afterward transferring a portion of these to a larger ledger
account with Whiteside, it does not appear Whiteside had any
connection therewith except to write the name for his uncle
at the head of the page. There is no proof when this name
was written nor when the transfer was made. There is
nothing in any way making these ledger entries binding
upon Whiteside. Whiteside was not bound to offer evi-
dence for the defense (Ward v. Durham, *supra*), and there
was no concealment about the manner in which he made up
his bill of particulars. There is nothing in his conduct
connected with said books and bill of particulars to charge
him with either fraud or collusion. It may well be that
by reason of Whiteside having had access to the journal for
the purpose of making up his bill of particulars, if there
were any other entries in said journal affecting Whiteside
and making against him, the executors would have been
entitled to offer those entries in evidence against Whiteside,
but there is nothing to make this principle apply to the
entries on the ledger page. Whiteside did not resort to it
to obtain the materials for his bill of particulars or use it in
any way. Whiteside's conduct in going over his uncle's

journal from the time he became of age, and allowing the estate credit for every item which his uncle had expended for him according to his uncle's own journal, appears to us entirely honorable and not a proper subject for complaint by the legatees. It does not follow because Whiteside made this use of so much of the journal as related to a period after he became of age and returned to his uncle's house, that the journal entries made in prior years when he was a minor and before the relationship between himself and uncle had been changed by his removal from his uncle's home, engaging in business for himself, and marrying, would be evidence against him. None of them were made as entries against him, and the proof shows the relation between the parties was thereafter wholly changed. But if they were made admissible in evidence against Whiteside because of his use of the later entries, still the withholding of them from evidence was but a lack of judgment or a miscalculation on the part of the executors for which Whiteside is in no way responsible, and which can not avail to defeat his judgment. It is to be remembered that these are not books of account in the ordinary sense, or kept in the regular course of business in trade or merchandising, and they are not governed by the rules affecting ordinary account books. As to the entries made by Goodrich on the page of his ledger headed "Whiteside," wherein he undertook to credit Whiteside with services at certain rates during the period covered by this claim, there is nothing to show that Whiteside was ever aware they were made or was in any way connected with the making of these entries, and they were not made in the regular course of any business, and were but self-serving declarations by Goodrich, which could not possibly have been put in evidence by the executors against the claim. We are unable to see wherein the executors were guilty of fraud in not producing these private accounts before the court, nor that their production would have availed the estate against this claim; but if there were any fraud on the part of the executors in not producing these books, there is no proof to make Whiteside a party to it.

Another fact in evidence should be stated as bearing both upon the good faith of the executors and the merit of this claim. Lumley, one of the executors, drew the will for Goodrich. During the discussions concerning the various provisions of the will, which was very lengthy, Goodrich told Lumley that the legacy he was giving Whiteside was not enough, and that he desired, outside of the will, to deed to Whiteside a certain house and lot and fifteen acres of land therewith, as compensation to Whiteside for his services to Goodrich; that he wished to do this besides giving him a legacy in his will in connection with his other nephews and nieces. In that conversation Goodrich told Lumley that he valued this house and lot and fifteen acres at $3,500. Lumley asked him for a description of the premises in order that he might draw the deed, and Goodrich prepared and sent him a description of the house and lot and fifteen acres. Lumley prepared a deed for the conveyance of said property from Goodrich to Whiteside. Lumley took this deed to Goodrich's house to present it to him for execution. He found Goodrich very ill, and in talking with him he found he was rational for a few moments and then out of his head. Goodrich told Lumley that the matter had been done, that Norton had been there and made out the deeds. Lumley understood this to mean that Norton had prepared the deeds to Whiteside for this house and lot and fifteen acres, and that Goodrich executed it, and, seeing Goodrich then was ill and at times irrational, felt it unnecessary to say any more about it, and went away, and did not learn until after the death of Goodrich that the deeds Norton had drawn related to certain cemetery property, and not to the house and lot and fifteen acres. The testimony does not leave it very clear to us when this conversation between Goodrich and Lumley took place. At one place in the testimony it appears to have been about the time the will was made, which was about eighteen months before Goodrich died, and in another place that particular conversation seems to have been during the same summer of Goodrich's death. Whenever it may have

been, it is evidence strongly tending to show that Goodrich considered the services Whiteside had rendered him after his return to his home worth $3,500, and deemed it his duty to compensate him for those services, and had abandoned whatever purpose he had when he gave Whiteside the small credits on the ledger for some of the same services, and had no intention of taking into account against Whiteside the moneys he had spent for him either in his infancy or while at school.

Many criticisms have been made upon the executors for things they said and left unsaid, and letters they wrote to the various legatees, and things they did and things they left undone, pertaining to the management of the estate, but we find in them nothing that casts upon them any suspicion of having wronged the legatees with reference to the claim of Whiteside.  We do not find that the Circuit Court prevented the introduction of any competent testimony.  Some testimony was permitted to be heard subject to objection, which was incompetent, but this is in effect a chancery proceeding, and in such proceedings it is assumed that the judge considered only the competent testimony.

The order of the court below is affirmed.